P. J. BLACK LUMBER CO. v. TURK, ET AL.

(No. 1958; November 24, 1936; 62 Pac. (2d) 519)
(Rehearing denied January 5, 1937)

362

For the appellant there was a brief by *Richard J. Jackson* and *M. S. Reynolds* of Cheyenne and oral argument by *Mr. Jackson.*

For the respondents, there was a brief and the cause was argued orally by *Water Q. Phelan* of Cheyenne, Wyoming.

*Richard J. Jackson* and *M. S. Reynolds* in reply.

BLUME, Justice.

This is an action brought by the P. J. Black Lumber Co., a Corporation, against Anna M. Turk, Oscar M. Turk, hereinafter mentioned as the mortgagors, and John H. Conway, and the Standard Loan Company, to foreclose a mortgage given by the Turks to the plaintiff to secure a promissory note, and to declare the mortgages given to Conway, either directly or in the name of the Standard Loan Company, to be junior and inferior to the mortgage of the plaintiff, upon certain cattle hereinafter mentioned. Issues were joined between the parties. The case was tried to a jury, which returned a special verdict. Judgment was rendered thereon as hereinafter mentioned and from that judgment the plaintiff has appealed to this court. The particulars of the judgment will be mentioned hereafter.

There is some conflict in the evidence, but it relates to minor matters to which no special reference needs to be made. On most of the points the evidence was uncontradicted. In brief, the jury were authorized to find the following facts:

On February 21, 1930, the Turks executed a promissory note in favor of the plaintiff for the sum of $1262.00. There was due upon this note at the time of the trial of this case the sum of $392.71. An additional note dated November 17, 1933, was given by Oscar M. Turk to the plaintiff, upon which there was due at the time of the trial the sum of $139.14. To secure the first note above mentioned, for the sum of $1262, the Turks made and executed to the plaintiff on the date on which the note was given a chattel mortgage on twelve Holstein heifers, two years old, and eighteen Holstein milk cows and the increase thereof, the cattle bearing one of five different brands, including a so-called "wagon-hammer" brand hereinafter more particularly mentioned; the cattle being located on Turk's farm about one and one-half miles southeast of Cheyenne, Wyoming. On February 12, 1932, the Turks executed to John H. Conway, to secure the sum of $3000, which is still unpaid, a chattel mortgage on certain personal property including eighteen Holstein cows and the increase, sixteen head of Holstein heifers ranging from one and one-half to four years old, located on the place known as Turk's Dairy, about one and one-half miles southeast of Cheyenne, Wyoming. On September 8, 1932, the Turks executed to the Standard Loan Company a mortgage on the same property covered by the mortgage of February 12, 1932. This mortgage was given to secure the sum of $560, still unpaid. On October 13, 1933, the Turks executed a like mortgage to secure the sum of $512.50, covering the same cattle hereinbefore mentioned. On March 22, 1934, the Turks executed a like mortgage to secure the sum of $800 on eighteen head of Holstein cows and all increase, sixteen head of Holstein heifers, four to six years old, and all increase, all branded on the right hip, all kept on the place known as Turk's Dairy, located about one and one-half miles southeast of Chey-

enne, Wyoming, the sum secured being still unpaid at the time of the trial of this case. John H. Conway did business as the Standard Loan Company, and all mortgages will be treated as those of Conway. While the mortgage to the plaintiff describes eighteen Holstein cows, it appears that some of these cows were already dead, or had been sold and the proceeds applied on a mortgage to the Wyoming Investment Company, to which the Black Lumber Company mortgage was made subject. The mortgagors had at that time only six Holstein cows and twelve Holstein heifers. Six of the heifers were sold with the consent of the plaintiff and the proceeds, amounting to $270, were applied on the indebtedness. Four of them were sold to Clay Robinson & Company and brought only the total sum of $13.50; one was sold to a Mr. Smith and brought only the sum of $5.00. Four of the heifers died in 1933, the remainder in 1934. There was no increase of these cattle, on account of the fact that a dairyman, as Turk was, does not raise the increase. Hence none of the cattle covered by the mortgages to Conway are in fact any of the cattle mentioned in the mortgage to plaintiff, nor the increase thereof. Commencing with 1932, the Turks bought new cattle with money furnished by Conway, namely, eighteen head of Holstein cows and sixteen head of Holstein heifers. At the time when this money was borrowed from Conway the Turks promised and agreed that they would secure the money borrowed from Conway by a mortgage upon the cattle which he would buy in the future. Part of the money furnished by Conway was used for the purpose of paying off the mortgage of the Wyoming Investment Company hereinbefore mentioned. The Turks owned a brand in 1923 to 1925, which was called by Mr. Turk the "wagon hammer brand." Some of the cattle covered in plaintiff's mortgage probably bore this partic-

ular brand, and on the left hip. That brand is marked thus: ＼匚 The rights of the Turks to this brand were lost from and after 1925. The brand, similar to the reverse thereof, and described in the plaintiff's mortgage, is marked thus: 匚− This brand appears to have been copied, by the person who drew the mortgage, from the prior mortgage to the Wyoming Investment Company. That brand was not, in fact, owned by the Turks in 1930. On March 28, 1932, a certificate was issued to the Turks for a new brand, marked 匚＼ and to be used on the right hip of the cattle.

Special interrogatories were submitted to the jury and answered as follows:

"1. Do you find from all of the evidence in this case that the cattle owned by defendants Oscar M. Turk and Anna M. Turk on November 24th 1934 (the date of filing of Plaintiff's petition), are branded with the same brand as the cattle described in the Plaintiff's mortgage? Answer: No.

2. Are the brands, or any of them, mentioned and set forth in the mortgage from the Turks to the plaintiff company, the same identical brands as any of the brands on cattle embraced by the several mortgages from the Turks to Dr. Conway, or to his company, the Standard Loan Company? Answer: No."

The court adopted the finding of the jury, and rendered judgment declaring that the plaintiff's mortgage is not a prior lien on the cattle then in the possession of the Turks, and declaring the first mortgage to Conway to be the first lien thereon.

1. Counsel for the plaintiff, in asserting the priority of lien on the cattle in question, contend that the Conway mortgages are void because the description of the cattle is too indefinite. However, there is evidence in the case which seems to indicate that plaintiff had knowledge of the fact that the cattle included in its mortgage were sold or had died, and that hence the other cattle, included in the Conway mortgages, were

different cattle. It is said in 11 C. J. 460 that "persons with actual knowledge of the property covered by the mortgage stand in no better position than the mortgagor in respect to their right to object to an insufficient description in the mortgage." It is not necessary, however, to pass upon this point at this time. The action herein is one to foreclose a lien under a mortgage. Unless that lien exists, the question of definiteness of description in the Conway mortgages is immaterial.

The cattle covered by plaintiff's mortgage have ceased to exist; there is no increase thereof. Those which the Turks had at the time of the commencement of this suit and at the time of the trial herein are entirely different cattle. The mortgage itself does not cover after-acquired property. Prima facie, therefore, the plaintiff has no lien thereon. 11 C. J. 501. But counsel for plaintiff contend that they have such lien by reason of the provisions of section 71-102, Rev. St. 1931, which provides that it shall be a sufficient description in a chattel mortgage on live stock

"to set forth therein all such brands and marks of the same as will convey to the mortgagee in all particulars the power and ability to identify, prove and recover any and all such that was possessed by the mortgagor at the time of making such mortgage; together with the ranches or range upon which such * * * live stock shall be running or ranging; and such mortgage * * * shall be held to convey and cover all the * * * live stock which shall then be marked or branded with the said mark or brand belonging to the mortgagor, and which thereafter may be acquired by him, and be marked and branded with the said mark and brand, and also such mark or brand."

Counsel for plaintiff claims that under this provision the plaintiff's mortgage embraced not only the cattle branded as set forth in the mortgage, but also all cattle branded with the same brand thereafter. The

cattle actually owned by the Turks at the time of the execution of plaintiff's mortgage were not branded with the same brand as the cattle in controversy here; the brand used, if at all, on any of the former was the exact reverse of the brand used on the latter, and was placed on a different part of the animal, and we could not say that, as a matter of law, the two brands are the same. Counsel for plaintiff contends, however, that this is wholly immaterial. That the important thing is what brand is contained in the plaintiff's mortgage, and what brand is on the cattle in controversy. He contends that the uncontradicted evidence in the case shows that the brand so described in the mortgage, and the brand so placed on the animals in controversy, is identical, and that hence plaintiff's position, in reference to priority of lien, is insurmountable. The jury, however, found its contention to be untrue. This court is not composed of expert cattlemen, nor is it intimately acquainted with brands and the importance thereof, and in case of doubt we should rather be inclined to agree with the jury, who may have known more about brands than we, rather than with counsel for the plaintiff, who, we presume, is not in much better position in connection with knowledge of brands than the members of this court.

In 1930, when plaintiff's mortgage was executed, the Turks owned no brand whatever. Section 67-211, Rev. St. 1931 provides:

"No person, company or corporation shall claim or own any brand or mark which has not been recorded in the office of the secretary of the state board of live stock commissioners in accordance with this article, and any failure to so record a brand or mark shall be deemed an abandonment of the same; provided that no person, company or corporation shall be at liberty to claim or use any such abandoned brand or mark until after he had caused the same to be recorded in compliance with the terms of this article."

The Turks had the right, of course, to mortgage any cattle owned by them, no matter what brand they might bear. But it is clear that they had no right to use any brand unless they owned it and it was recorded. The Turks, at the time of the execution of plaintiff's mortgage, did not, as stated, own the brand mentioned therein, nor was such brand recorded. They had no right under that state of facts to put it upon any cattle that might subsequently be acquired, nor is there anything in the record to show that the acquisition of that brand by the Turks was contemplated. Hence the question arises whether section 71-102, supra, has any application under such a state of facts, and that from two different angles. We cannot presume that the parties intended anything unlawful, and it is certain, accordingly, that it was not in the contemplation of the parties that any cattle subsequently acquired by the Turks and marked with the same brand as that mentioned in the mortgage should be covered by the mortgage. It is stated that a chattel mortgage will be held to cover after-acquired property only if the court, under its terms, would have decreed specific performance of a contract to sell or pledge it. 11 C. J. 462. And it can scarcely be doubted what a court of equity would say when asked to enforce an agreement which never existed and could not well be said to have been in contemplation of the parties.

Again, it may be noted that section 71-102, supra, contemplates that when the description of cattle in a chattel mortgage is by brand, not only after-acquired property is covered, *but also the brand itself*. We can readily see, of course, that when an owner of a brand gives a chattel mortgage, identifying his animals included therein, by such brand, fraud will be prevented by the application of the rule of the statute. And there would seem to be no doubt that the statute primarily contemplates such a case. The question here is whether

it contemplates any other situations—i. e., whether it contemplates situations in which the mortgagor is not the owner of the brand. It is certain that it does not contemplate a situation where the mortgagor is not the owner of the brand at the time when after-acquired property comes into existence, for the brand cannot lawfully be used unless it is then owned by the mortgagor and is recorded. It may be that situations may arise under which, at least as between the parties, a court of equity would hold that, though the mortgagor may not be the full and legal owner of the brand, he would be held to be so under the circumstances, or that he would be held to be estopped from claiming otherwise. But that is hardly true in the case at bar, for both parties must be held to have known that the mortgagors were not the owner of the brand now on the cattle in controversy, and there is nothing, as stated before, which indicates that the acquisition of the brand was contemplated at the time of the execution of the mortgage. The acquisition of that brand subsequently was fortuitous; some one else might have applied for it in the meantime; the grant thereof depended on the will of a third party—the state board of live-stock commissioners.

Still, in the case at bar, the mortgagors actually became the owners of the brand on the cattle in controversy, and the question before us narrows itself. In spite of the fact that, as stated, a court of equity would not, on equitable grounds, enforce, under the circumstances disclosed herein, a mortgage on after-acquired property, branded with the brand mentioned in the mortgage, must it, nevertheless, be enforced because of the statute, and in the face of the fact that the latter prescribes that the mortgage shall cover the brand itself? If so, it would seem that we are also compelled to hold that the mortgage now covers the brand itself, for the statute not alone, by its terms, covers after-

acquired property, but the brand itself as well, and the two seem to be so closely connected and dependent one upon the other that it is difficult to see how they can be separated. Moreover, according to plaintiff's theory, everything branded with the brand is covered with the mortgage; the brand, then, is the principal thing; everything else is accessory. It is hardly probable, however, that the statute contemplates that a mortgagor may convey a brand not in existence at the time of the execution of a mortgage, and thus bind the hands of the state board of live stock commissioners. We have searched, but have searched in vain, to find a statute of some other state like or similar to section 71-102, supra. The statute has not been analyzed by counsel for either party herein, and we think it advisable, accordingly, to leave the determination of the full meaning thereof for the future, when further light may be shed upon it by other situations. Hence we shall turn our attention to the direct question of identity of the brands in controversy. That has a bearing in this case, of course, only on the point as to whether or not after-acquired property is included in the mortgage to plaintiff. It has nothing to do with the description, imperfect or otherwise, of cattle actually included in a mortgage and in existence at the time of the execution thereof.

It is not at all as clear to us as it is to counsel that the brand mentioned in plaintiff's mortgage is the same brand as that which has been placed on the cattle in controversy. The line on the right of the main part of the brand mentioned in plaintiff's mortgage is horizontal. In the brand on the cattle in controversy— granted to the Turks on March 28, 1932—the line is not horizontal, but slants downward at an angle of about 45 degrees. Counsel for defendant Conway apparently deems the difference important, vital and controlling, and seems to rest his argument of the non-

identity of the brands in controversy thereon. Perhaps the difference is small. It appears so to us. But we are not experts on brands. If, however, we are permitted to overlook the difference, we must note another point. Is a mark mentioned in a mortgage, without specifying the place where it is to be used on an animal, the identical brand as a mark of the same character, which, under the law, can only be, and is only, used on some particular place of the animal? Or rather, can we say as a matter of law that these brands are identical, and are we required to overturn the finding of the jury to the contrary? The brand in the mortgage to plaintiff does not state on what part of the animal it is to be found or used. The brand on the cattle in controversy can lawfully be, and is, only used on the right hip of the cattle. Our statute does not define a brand, but it recognizes the place of the brand as an important part thereof. Sec. 67-204 provides that the secretary of the state board of live stock commissioners shall keep a record of brands which states the "definite place of the brand upon the animal." The brand certificate in the record, issued March 28, 1932, states that "the law requires that this brand must be used exactly as recorded and only for the locations specified." We find no law which makes this direct statement, but it is significant as showing, doubtless, the interpretation which the state board of live stock commissioners have placed on the law. Section 71-102, supra, contemplates a brand "which will convey to the mortgagee in all particulars the power and ability to identify, prove and recover any and all" stock marked with that brand. It does not appear from the record whether the state board of live stock commissioners grants a brand to more than one party, but with the place of use on the animal different in each case. For this reason, if for no other, we are not in position to state whether or not a description of a brand, no fur-

ther identified than the brand in plaintiff's mortgage, would enable any one to identify cattle branded, as are the cattle in controversy, on the right hip, and is in fact a brand in contemplation of sections 67-204 and 71-102, supra. Hence we cannot say that the jury and the trial court were wrong, and we cannot hold that the brand in plaintiff's mortgage, without identification as to place of use, is, as a matter of law, the same brand as the one on the cattle in controversy.

2. It is argued that, in the face of the uncontradicted testimony in the case, the jury did not allow plaintiff a sufficient attorney's fee. Plaintiff was not entitled to any such fee except as to the Turks. An allowance thereof is ancillary only to the main judgment. There is no judgment in this case against the Turks. They admitted the indebtedness, but no judgment against them was, for reasons not explained, ever rendered, and no complaint of the lack thereof is made herein. Hence the question of allowance of attorney's fee is not before us.

The judgment of the trial court is, accordingly, affirmed.

*Affirmed.*

KIMBALL, Ch. J., and RINER, J., concur.

### ON PETITION FOR REHEARING

BLUME, Chief Justice.

A petition for rehearing has been filed herein. Counsel for plaintiff and appellant claim that "nowhere throughout the testimony in this case is there any evidence of any other brands than the one which the Turks lost in 1925 and its reverse, acquired in 1932"; further, that the effect of Turk's testimony is that the brand contained in plaintiff's mortgage is the one acquired in 1932; that no controversy arose during the trial of the case as to any more than two brands, and

that hence, the jury's finding is necessarily not supported by the evidence. We discussed these matters fully in the original opinion. To clarify the matter, however, we shall, briefly, restate in a somewhat different manner the situation in the respects mentioned. The question whether or not the brand mentioned in plaintiff's mortgage is the same as the brand acquired by the Turks in 1932 clearly arose in the case, contrary to counsel's contention. In fact, it was apparently the main question in the case, for special interrogatories were submitted to the jury on that point, and they answered the interrogatories in the negative. True, Turk called the various brands, apparently including that mentioned in plaintiff's mortgage, the "wagon hammer brand," but the naming of the brand could not be conclusive in the matter. The testimony shows that the Turks owned a brand called the "wagon hammer brand" in 1923-1925. That brand was placed on the left side of the animals. They owned no brand from 1925 to 1932. In the latter year they acquired the reverse of the former brand, also called the wagon hammer brand, placed on the right side of the animals. Turk's testimony as to the brand in plaintiff's mortgage is, it is true, perhaps somewhat confusing. But the facts are clear. In question and answer 62 Turk specifically testified that the brand mentioned in plaintiff's mortgage is not his wagon hammer brand. And the further testimony appears in the record: "Q. 362. Now are any of the cattle included in the Black mortgage, branded the same as any of the cattle included in the Conway mortgage?" "A. No." In any event, a brand was mentioned in the plaintiff's mortgage; the latter was introduced in evidence by plaintiff. That spoke for itself. The brand there mentioned did not describe the place or location of the brand. Moreover, the line on the right is different from the brand acquired in 1932. Here, accordingly, was introduced into

the case by plaintiff itself a third brand differing in the two respects mentioned from the other brands. We held that it was a question for the jury to say as to whether or not this particular brand, thus introduced into the case by the plaintiff, was the same brand as that acquired by the Turks in 1932. We think that we were correct in this holding, and when that point was determined adversely to the plaintiff, the conclusion that plaintiff has no right to the cattle in controversy here necessarily followed.

No other points need, accordingly, be discussed. We might, however, briefly state that points two and three in counsel's brief on rehearing relate mainly to the construction of the statutes mentioned in the original opinion and the application thereof in the case at bar. We discussed these statutes at length in our first opinion, and we can add very little to what we then said. We might, however, mention that counsel state that a mortgagee should not be prejudiced by the fact that the mortgagor did not happen to have a brand recorded which he claimed and intended to record later. But that is not the situation in this case. The Turks had no brand in 1930, when plaintiff's mortgage was given. The brand of 1932 had been owned by Mr. Veta, and the testimony is clear, we think, that the Turks did not only not record it, but that they did not acquire it till 1932. There was, of course, as we stated in the original opinion, nothing to hinder the Turks from mortgaging to plaintiff any cattle which they then owned, no matter with what brand they might be marked. The mortgage was perfectly good as to then existing property owned by the Turks. But that is an entirely different matter from mortgaging future-acquired property branded with a brand which the mortgagors did not then own and did not acquire until two years later, and which, prima facie at least, could not

be held to have been intended by the parties to be included therein.

Counsel ask us to direct the trial court to enter a personal judgment in this case against the Turks. We do not think that the point is involved in the case. It will be recalled, as stated in our original opinion, that plaintiff did not ask for a personal judgment. That point, accordingly, was not an issue in the case, even though the Turks by their answer consented to a judgment against them for the amount due on plaintiff's note. As now advised, however, we can see no particular reason why, if plaintiff desires a personal judgment against them, that matter could not, upon notice, and upon amendment of the prayer of the petition, be disposed of in this case, after it is sent back to the trial court, rather than in another action.

The petition for rehearing is, accordingly, denied.

RINER and KIMBALL, JJ., concur.